IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DCOR, LLC,                                  §
                                           §
        Plaintiff,                         §
                                           §
v.                                         §        Civil Action No. 3:21-CV-00120-N
                                           §
UNITED STATES DEPARTMENT                    §
OF THE INTERIOR, *et al.*,                  §
                                           §
        Defendants.                        §

## MEMORANDUM OPINION & ORDER

This Order addresses Plaintiff and Defendants' cross-motions for summary judgment [45, 55]. For the reasons set forth below, the Court grants in part and denies in part both motions and remands the case for further proceedings.

## I. THE ROYALTY DISPUTE

This case arises out of a dispute over royalty payments on oil and gas produced from federal offshore leases. Plaintiff DCOR, LLC ("DCOR") is a Texas limited liability company that owns and operates oil and gas platforms associated with federal leases off the coast of Southern California. Pl.'s Second Am. Compl. 5 [42]. Defendants Debra Haaland, Secretary of the U.S. Department of the Interior (the "Department"), and Kimbra Davis, Director of the Office of Natural Resources Revenue ("ONRR"), oversee the administration of royalty payments. *Id.* at 6. DCOR seeks judicial review of the Department's order to pay over $19 million in additional royalties on oil and gas produced between 2007 and 2013. *Id.* at 2.

MEMORANDUM OPINION & ORDER – PAGE 1

### A. Statutory and Regulatory Framework

The Outer Continental Shelf Lands Act[1] governs oil and gas produced from federal offshore leases and authorizes the Secretary of the Interior to implement regulations governing royalty payments for such production.   The Federal Oil and Gas Royalty Management Act ("FOGRMA")[2] further requires federal lessees to calculate and pay royalties, and the Secretary may "audit and reconcile, to the extent practicable, all current and past lease accounts for leases of oil or gas and take appropriate actions to make additional collections or refunds as warranted."   30 U.S.C. § 1711(c)(1).   The ONRR Director conducts such audits on behalf of the Department.   *See* 30 C.F.R. § 1201.100.

The regulations at issue in this case are those governing royalties and product valuations.[3]   Federal lessees are required to pay royalties on their gross proceeds, which are "the total monies and other consideration accruing for the disposition of oil produced." 30 C.F.R. § 1206.101.[4]   Further, lessees must place production in "marketable condition" — i.e., free from impurities and acceptable to a typical customer — at no cost to the government.   *Id.*   Therefore, the calculation of gross proceeds includes costs lessees incur from placing production in marketable condition.   *Id.*   One cost that must be included in gross proceeds is "gathering," which the regulations define as:

---

[1] 43 U.S.C. § 1331, *et seq.*
[2] 30 U.S.C. § 1701, *et seq.*
[3] Unless otherwise specified, the Court refers to the 2013 version of the Code of Federal Regulations, which was in effect during the audit period.
[4] For this definition and those that follow in this section, the Court cites only the federal regulations governing oil.   The regulations for gas have nearly identical definitions, and the parties agree that they should be construed the same way.   For the definitions of gross proceeds, gathering, and transportation under the gas regulations see 30 C.F.R. § 1206.151.

> [T]he movement of lease production to a central accumulation or treatment point on the lease, unit, or communitized area, or to a central accumulation or treatment point off the lease, unit, or communitized area that BLM [Bureau of Land Management] or BSEE [Bureau of Safety and Environmental Enforcement] approves for onshore and offshore leases, respectively.

*Id.*

However, lessees may deduct transportation allowances from gross proceeds.  The regulations define "transportation allowance" as:

> [A] deduction in determining royalty value for the reasonable, actual costs of moving oil to a point of sale or delivery off the lease, unit area, or communitized area.

*Id.*   The regulations make clear that the "transportation allowance does not include gathering costs." *Id.*  At issue in this case is the distinction between permissible deductions for transportation and impermissible deductions for gathering.

### B. Background and Agency Proceedings

As mentioned above, DCOR owns operating rights to oil and gas leases off the coast of California.   DCOR's production process is described and diagrammed in the administrative record. *See* AR0017299–307.  In short, oil and gas production is initially accumulated and treated on several offshore platforms.  The production from the multiple platforms is then transmitted through a "subsea tie-in" to an onshore facility for additional treatment.  At the onshore facility, the production reaches marketable condition and moves through an approved royalty measurement point.   The oil and gas are subsequently delivered to the purchaser.

MEMORANDUM OPINION & ORDER – PAGE 3

In 2011, DCOR asked ONRR for guidance on how to calculate its transportation allowances. AR0017307–308. ONRR reviewed DCOR's reporting and discovered multiple errors, prompting ONRR to initiate an audit in 2014. *Id*. The audit led to three orders: (1) Order to Report and Pay (February 24, 2017)[5] ("First Order"); (2) Order to Report and Pay (February 22, 2018)[6] ("Second Order"); and (3) Order to Report and Pay (July 30, 2018)[7] ("Third Order"). The Orders required DCOR to pay $9,445,700.54, $7,559,910 and $64,588.82 in additional royalties respectively. AR0017091; AR0017198; AR0017227. DCOR appealed each Order to the ONRR Director, filing three Statements of Reasons. AR0017950–18018 ("First Statement of Reasons"); AR0017590–611 ("Second Statement of Reasons"); AR0017462–469 ("Third Statement of Reasons").

In August 2019, the Director addressed the appeals in a consolidated decision (the "Decision"). AR0017297–340. The Decision concluded that DCOR had improperly deducted transportation allowances for the movement of production from its offshore platforms to onshore treatment facilities, as that cost was instead nondeductible gathering. AR0017324. Indeed, the Director determined that "gathering does not end until production is measured for royalty purposes," AR0017311, and DCOR was "precluded from claiming transportation allowances upstream of its onshore royalty measurement points, regardless of where its production achieves marketable condition." AR0017324. Further, the Decision concluded that DCOR had improperly deducted a $0.02 per unit "fee"[8] from its

---

[5] Found at AR0017091–197.
[6] Found at AR0017198–226.
[7] Found at AR0017227–289.
[8] This term is disputed. *See* Section V, *infra*.

gross proceeds.   AR0017332.   Ultimately, the Decision ordered DCOR to pay $19,396,135.38 in royalties under all three Orders.  AR0017335.

DCOR appealed the Decision to the Interior Board of Land Appeals ("IBLA"). However, the IBLA determined that it lacked jurisdiction to resolve the relevant issues because of FOGRMA's requirement that a final decision issue within thirty-three months of the commencement of an agency proceeding.  AR0020174.  DCOR now seeks judicial review of the ONRR Director's Decision.

## II.  AGENCY REVIEW STANDARD

Under the Administrative Procedure Act ("APA"), a court must "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A). Judicial review under the arbitrary-and-capricious standard is deferential.[9]   *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  A court "may not substitute its own policy judgment for that of the agency," but must instead "ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *Id.*  If "the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld."  *Clean Water Action v. EPA*, 936 F.3d 308, 312 (5th Cir. 2019) (internal citation omitted).

---

[9] Here, the Department does not invoke the more lenient standard of review under *Auer v. Robbins*, 519 U.S. 452 (1997).  Defs.' Reply Br. 5 n.3 [63].

MEMORANDUM OPINION & ORDER – PAGE 5

"It is well established that when a district court reviews a summary judgment motion concerning an agency's action, the court determines not whether the material facts are disputed, but whether the agency properly dealt with the facts." *Garcia for Congress v. FEC*, 22 F. Supp. 3d 655, 659 (N.D. Tex. 2014) (cleaned up). Therefore, district courts in APA cases "sit[] as an appellate tribunal," and "the entire case on review is a question of law." *Nat'l Ass'n of Mfrs. v. SEC*, ---F. Supp. 3d ---, 2022 WL 17420760, at *2 (W.D. Tex. 2022) (internal citation omitted).

### III. DCOR WAIVED ANY ARGUMENT NOT PRESENTED TO THE DIRECTOR

"A federal court reviewing an agency determination will not ordinarily consider arguments that a litigant could have raised before the agency but chose not to." *Palm Valley Health Care, Inc. v. Azar*, 947 F.3d 321, 327 (5th Cir. 2020). This principle ensures that courts do not "topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 175 (5th Cir. 2012) (quoting *Sims v. Apfel*, 530 U.S. 103, 115 (2012) (Breyer, J., dissenting)). Here, Defendants contend that DCOR waived any argument it did not raise in its initial Statements of Reasons to the Director. Defs.' Mot. Summ. J. Br. ("Defs.' MSJ") 15 [56]. Defendants claim these waived arguments include: (1) that Defendants violated DCOR's lease terms; (2) that Defendants retroactively changed the lease terms; and (3) that Defendants treated DCOR differently than similarly situated lessees. *Id.* at 17. The Court agrees.

As discussed in Section I.B., *supra*, the IBLA found that it lacked jurisdiction to review the majority of the Director's Decision. AR0020174. DCOR does not challenge

this finding, but instead seeks review of the Director's Decision on the merits.  *See* Pl.'s Mot. Summ. J. Br. ("Pl.'s MSJ") 1–3 [46].  Thus, the Director's Decision is the final agency action with respect to the issues here.  *See* AR0020123.

The Court concludes that DCOR must have raised its arguments before the Director to preserve them for review.  The Court will not overturn the Decision as arbitrary and capricious based on arguments the Director did not have the opportunity to address. Further, IBLA case law indicates that it would not have addressed new arguments on appeal: "generally it is best to allow the initial decisionmaker to confront objections to proposed actions and to limit the Board's review to appeals of decisions addressing those objections." *S. Utah Wilderness All.*, 128 IBLA 52, 59 (1993).  Thus, any argument not included in DCOR's three Statements of Reasons is waived.[10]

Upon review of the original Statements of Reasons, the Court concludes that DCOR did not properly preserve its lease or retroactivity arguments.  DCOR's Statements of Reasons made no mention of its lease terms nor any alleged change in interpretation of its lease.  *See generally*, AR0017950–18018, AR0017590–611, AR0017462–469.  Further, DCOR did not raise disparate treatment compared to current, specific leases.  Its Statements of Reasons mentions only that the initial Orders failed to cite any similar prohibition of transportation allowances, and that the Orders deviated from practice with its predecessors-

---

[10] DCOR relies on *Devon Energy Prod. Co., L.P. v. Gould*, 421 F. Supp. 3d 1213 (D. Wyo. 2019), to argue that the inclusion of its IBLA arguments in the administrative record renders them appropriate for review here.  But in *Gould*, the court permitted the plaintiff to raise new *evidence* — not entirely new *arguments* it failed to raise before the ONRR Director.  *Gould*, 421 F. Supp. 3d at 1235–36.

in-interest.  AR0017603.  Accordingly, the Court declines to address DCOR's lease, retroactivity, or disparate treatment arguments.  However, the Court will consider DCOR's argument regarding its predecessors below.

### IV. THE DECISION'S DEFINITION OF GATHERING WITHSTANDS ARBITRARY AND CAPRICIOUS REVIEW

DCOR raises several arguments challenging the Decision's conclusion that "gathering does not end until production is measured for royalty purposes," AR0017311, and that DCOR was "precluded from claiming transportation allowances upstream of its onshore royalty measurement points, regardless of where its production achieves marketable condition." AR0017324.  The Court addresses each argument in turn.

### A. The Decision Reasonably Distinguished Between Initial and Final Treatment

As mentioned in Section I.A., *supra*, gathering is the movement of production to a "central accumulation or treatment point." 30 C.F.R. § 1206.101.  DCOR argues that the Decision ignored the fact that DCOR's oil and gas are *initially* accumulated and treated on the offshore platforms.  Pl.'s MSJ 25–26.  But the Director acknowledged DCOR's system and determined that central accumulation did not occur until production reached the final onshore treatment facility and approved royalty measurement point.  AR0017322.  The Director's distinction between initial and final treatment is consistent with the relevant precedent.  *See Nexen Petroleum*, 57 IBLA 286, 298–99 (2002) (rejecting argument that the initial treatment point is the end of gathering); *Kerr McGee*, 147 IBLA 277, 283 (1999) (finding that the movement of production for additional treatment constitutes gathering).

Thus, the Decision was not arbitrary or capricious in determining that gathering does not end at initial treatment points.

### B. The Decision Reasonably Considered Department Precedent

An unexplained inconsistency in agency policy could be a reason for holding an interpretation to be arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). Here, DCOR contends that the Decision is arbitrary and capricious because it contradicts settled precedent showing that transportation begins at offshore platforms. Pl.'s MSJ 26–32. The Court disagrees; DCOR has not shown an established agency policy, and even if it did, the Decision provides a reasonable explanation for its current interpretation of gathering.

First, the cases permitting transportation allowances from offshore platforms do not support DCOR's position here. These cases predate the 1988 regulations that applied during the audit period. *See Shell Oil Co.*, 70 I.D. 393 (1963); *Sun Oil Co.*, GS-60-O&G (FE), 1974 WL 371665 (1974). As the Court will discuss in Section IV, *infra*, the Director reasonably concluded that the 1988 regulations reflect a different understanding of gathering.

Second, DCOR's post-1988 citations do not require transportation allowances upstream of the royalty measurement point. DCOR mistakenly relies on *Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030 (D.C. Cir. 2008), to claim that transportation begins offshore — before production reaches marketable condition. But *Devon Energy*, involved transportation costs *downstream* of the company's royalty measurement point, *id.* at 1034–

35, and is thus consistent with the Decision's conclusion that DCOR could not claim transportation allowances *upstream* of its royalty measurement point.[11]   Further, *Nexen Petroleum U.S.A., Inc., v. Norton*, 2004 WL 722435 (E.D. La. 2004), supports the Director's definition of gathering.  There, the court affirmed the Department's decision that movement from seven offshore platforms to a central accumulation point was gathering. *Nexen Petroleum*, 2004 WL 722435, at \*11.  The point of central accumulation for Nexen was also where production was measured for royalty purposes.  *Id.*

Third, DCOR's other citations do not create a general rule that ONRR must permit transportation allowances for the movement of production from platforms to shore.  Indeed, the issues in these cases are factually distinguishable.  *See Shell Offshore Inc.*, 142 IBLA 71, 73 (1997) (whether the capital cost to improve a platform was an integral part of a transportation system); *ARCO Oil & Gas Co.*, 109 IBLA 34, 38 (1989) (whether transportation allowances are permissible beyond a point of sale); *W&T Offshore, Inc.*, 189 IBLA 238, 241 (2017) (whether remediation costs constitute reasonable transportation allowances).  The Court will not deem the Decision arbitrary and capricious without clearly conflicting precedent.

Finally, the Decision provides a thorough and reasonable discussion of Department precedent.  Even if DCOR had shown a post-1988 agency policy of permitting

---

[11] Although DCOR focuses on where production reaches marketable condition, the Decision's ultimate conclusion was that DCOR could not claim transportation allowances upstream of its royalty measurement point, regardless of where production reaches marketable condition.  AR0017324.  Indeed, the Decision acknowledges instances in which transportation can begin before production reaches marketable condition.  *Id.*

transportation allowances for movement to shore, the Decision would not be arbitrary or capricious.  The Decision analyzed the relevant cases, which support the conclusion that gathering does not end until production reaches regulation requirements.  AR0017321–324.  The Court thus declines to vacate the Decision on the basis that it is an unexplained change in agency policy.

### C. The Decision Reasonably Interpreted the 1988 Regulations

DCOR argues that the Decision's interpretation of the 1988 regulations is arbitrary and capricious because (1) it improperly relies on the preamble and (2) the Department does not follow its own interpretation.  Pl.'s MSJ 32–34.  Both arguments fail.

Although a preamble is "not binding and cannot be read to conflict with the language of the regulation itself," *Peabody Twentymile Mining, LLC v. Sec'y of Lab.*, 931 F.3d 992, 998 (10th Cir. 2019), courts have recognized that a "preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules."  *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999).  Here, the Director cited the preamble to "further clarify the meaning of central accumulation and/or treatment point."  AR0017319.  The preamble responds to industry concerns about the definition of "central accumulation" and assertions that transportation allowances should be available for all off-lease movement.  AR0017317.  The preamble states in relevant part:

> [W]hen approval has been granted for the removal of production from a lease, unit, or communitized area for the purpose of treating the production or accumulating production for delivery to a purchaser prior to the requirements of the operational regulations having been met, MMS[12] does

---

[12] The Minerals Management Service ("MMS") was ONRR's predecessor office.

MEMORANDUM OPINION & ORDER – PAGE 11

not believe that any allowances should be granted for costs incurred by a
lessee in these instances.

AR0017317 (quoting 53 Fed. Reg. 1184–01, 1193 (Jan. 15, 1988), 53 Fed. Reg. 1230–01,

1240 (Jan. 15, 1988)).

The Court concludes that the Director's use of the preamble was not arbitrary or

capricious.  The interpretation is consistent with the text of the regulation, which does not

clarify the meaning of central accumulation.  And the preamble addresses the situation

here, where a lessee seeks transportation allowances for the movement of production before

such production has been measured for royalty purposes or reached marketable condition.

Based on a plain reading of the preamble in conjunction with the relevant precedent, the

Decision reasonably concluded that the 1988 regulations foreclose transportation

allowances prior to production reaching the royalty measurement point.[13]

Further, none of DCOR's cited cases support its assertion of a longstanding

interpretation of the 1988 regulations that transportation begins at offshore platforms.

Indeed, *Kerr-McGee Corp.*, 22 IBLA 124 (1975), and *Phillips Petroleum Co.*, 109 IBLA

4 (1989), do not apply the 1988 regulations.  And DCOR concedes that *Xeno, Inc.*, 134

IBLA 172 (1995), supports the Director's position that transportation begins after the

royalty measurement point.  Pl.'s MSJ 33 (explaining that in *Xeno,* "even though gas was

---

[13] DCOR contends that the 1988 regulations are consistent with past practice.  Pl.'s MSJ
29.  But the section of the preamble DCOR cites merely responds to concerns regarding
Indian contracts and reiterates the agency's policy of granting transportation allowances to
sales points off the lease.  *See* 53 Fed. Reg. 1184, 1206 (Jan. 15, 1988).  The Decision does
not contradict this policy, but instead finds that DCOR was moving production to central
treatment points — not to a sales point off the lease.  AR0017325–326.

moved in the same field before accumulation, all costs were deductible transportation because the royalty measurement point was at the wellheads"). Thus, the Director's interpretation of the 1988 regulations is not arbitrary or capricious.

### D.  The Decision Reasonably Concluded That DCOR Could Not Rely on Its Predecessors

DCOR next argues that Defendants arbitrarily treated it differently than its predecessors-in-interest, Plains Exploration & Production Company ("PXP") and Nuevo Energy Company ("Nuevo").  Pl.'s MSJ 34–37.  PXP and Neuvo previously owned and operated the same facilities, and the Department permitted them to take transportation deductions for the cost of moving production to shore.  AR0017298 n.2.  But, as the Decision notes, those allowances were permitted through a settlement agreement, which specifically disclaimed its future use:

> Neither PXP nor the Department shall be deemed to have approved, accepted, or consented to any concept, method, theory, principle, or statutory, regulatory, or contractual interpretation underlying or supposedly underlying, any of the matters agreed to herein or raised in connection with the issues settled herein. This Settlement Agreement shall have no precedent-setting value and shall not be binding on any party as to any issues, leases, or any time periods, other than those specifically addressed herein.

AR0017010.  The Director thus reasonably concluded that DCOR could not rely on the settlement as evidence of the Department's past policy.

The Director also rationally dismissed DCOR's reliance on letters from MMS employee Mary Anne Guilinger.  As the Decision notes, Guilinger's communications were nonbinding because she lacked the authority to issue rules and regulations on behalf of

ONRR.[14]  AR0017326–327; see *also Devon Energy Corp.*, 551 F.3d at 1039–40 (finding an agency letter nonbinding because it did not "mark the consummation of the agency's decision process" nor "determine the rights or obligations of regulated parties").  Here, Guilinger's letters reflect guidance for a specific company rather than a formal agency position.  *See generally* AR0019269–317.  DCOR has not shown that the Decision was arbitrary and capricious with respect to its predecessors.[15]

## V.  THE DECISION'S REJECTION OF THE TWO-CENT FEE WITHSTANDS ARBITRARY AND CAPRICIOUS REVIEW

As previously discussed, lessees must place production in marketable condition at no cost to the government and pay royalties on gross proceeds.  30 C.F.R. § 1206.152(i).  Accordingly, the value of gross proceeds includes the amount lessees pay for "certain services[,] the cost of which ordinarily is the responsibility of the lessee to place the gas in marketable condition or to market the gas."  *Id.*  In other words, lessees may not reduce the value of their gross proceeds by outsourcing services.  Impermissible deductions include third-party marketing fees.  *Id.* at § 1206.157(g).

Here, DCOR sold gas to another company, Pacific Summit Energy LLC ("PSE"), and deducted $0.02 per unit from its gross proceeds under the sales contract.  AR0017332.  The Director found that DCOR had improperly claimed such deductions because the two-

---

[14] DCOR argues that the letters were binding because 30 C.F.R. § 1206.111(*l*) requires companies to obtain agency approval of cost allocation procedures.  Pl.'s MSJ 36.  But DCOR provides no authority stating that an employee's approval of a company's specific allocations binds the entire agency.

[15] As discussed in Section III, *supra*, the Court will not address new arguments not raised before the Director.  The Court thus declines to consider DCOR's allegation of disparate treatment compared to Freeport-McMoRan Oil & Gas LLC.

cent differential was a nondeductible marketing fee.  AR0017334.  DCOR now argues that this finding is arbitrary and capricious.  Pl.'s MSJ 38–40.  The Court disagrees.

The Director reasonably concluded that DCOR paid a two-cent fee to PSE for marketing services.  The Director found that DCOR first entered into an agreement with Southern California Gas Company ("SoCal") for gas deliveries.  AR0017333.  The SoCal contract provided that "[a]ny imbalance created because the actual physical flow is different tha[n] the scheduled quantities will be the operational imbalance which will be the responsibility of the producer to eliminate pursuant to this agreement."  AR0017333 (quoting California Gas Producer Access Agreement between Dos Cuadras Offshore Resources, LLC and Southern California Gas Company Date and Effective January 1, 2005 for Deliveries on January 1, 2005).  DCOR subsequently entered into a sales contract with PSE.  AR0017333.  Transaction confirmations executed pursuant to the PSE contract stated:

> PSE shall monitor DCOR's actual Gas deliveries at the Facilities and PSE will have the right to increase or decrease actual deliveries at the Delivery Points or adjust DCOR's daily nomination with the Transporter SoCalGas if DCOR's current actual Gas deliveries does not correspond with the effective Monthly Nominated Quantity in order to limit or reduce any imbalances.

*Id.* (quoting September 1, 2013 Transaction Conformation for Immediate Delivery between DCOR and PSE).  Thus, the first contract obligated DCOR to monitor and eliminate imbalances with SoCal, and the second required PSE to monitor imbalances for the same production.  It was rational for the Director to conclude that DCOR had outsourced its monitoring requirements, and the two-cent price differential constituted fees for PSE's services.

MEMORANDUM OPINION & ORDER – PAGE 15

DCOR further claims that the Decision is arbitrary and capricious because it ignored DCOR's arguments that (1) PSE had merely purchased gas and (2) the two cents was a price adjustment and not a flat fee.  But the Decision implicitly refuted these arguments, noting that the contract "authorized PSE to use DCOR's imbalance trade mechanisms to balance its account with SoCal," AR0017333, and that DCOR had not shown why PSE would monitor and correct DCOR's imbalances with SoCal for free.[16]   AR0017334. Further, the Decision noted that DCOR had not provided evidence substantiating that the two cents was a price adjustment.  *Id*.   Given the contract language, the Decision's conclusion is not irrational, and the Director provided an adequate explanation.  The Court will not substitute its own interpretation when the Decision acted within a zone of reasonableness.  *See Prometheus Radio Project*, 141 S. Ct. at 1158.

### VI.  THE DIRECTOR ARBITRARILY FAILED TO ADDRESS WHETHER THE AUDIT COMPLIED WITH GOVERNMENT STANDARDS

"An agency's decision need not be crystal clear."  *Mariner Energy Inc., v. Watson*, 242 F. App'x 976, 979 (5th Cir. 2007).  A court may uphold an agency action with "less than ideal clarity" if the "agency's path may reasonably be discerned."  *Id.* (quoting *Steere Tank Lines, Inc. v. Interstate Commerce Comm'n*, 714 F.2d 1300, 1310 (5th Cir.1983)). However, "[a]n agency's action must be upheld, if at all, on the basis articulated by the agency itself, not reasons developed post hoc."  *Texas v. United States*, --- F.4th ---, 2022

---

[16] DCOR now argues that PSE was monitoring and balancing the gas for free because it was performing such services on its own gas. But its Statements of Reasons did not argue this point. They claimed only that the contract was for the purchase of gas as opposed to marketing services.  AR0018010–013; AR0017464–466.

WL 2466786, at *11 (5th Cir. 2022) (internal citation omitted); *see also DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) ("An agency must defend its actions based on the reasons it gave when it acted.").

DCOR contends that the audit and original Orders did not comply with Generally Accepted Governmental Auditing Standards ("GAGAS").[17]   DCOR raised this argument several times in its Statements of Reasons.   *See, e.g.*, AR0017608–610, AR0018008, AR0018016.   The Decision, however, did not address these arguments nor generally discuss the sufficiency of the audit.  *See generally* AR0017297–336.  Although Defendants raise evidence in the underlying record to show the audit complied with GAGAS, the Court will not address rationalizations developed for the first time here.  The Court thus concludes that the Decision's failure to address the audit issue is arbitrary and capricious.  The Court will discuss remedies in Section VIII, *infra*.

## VII.  The Decision Arbitrarily Increased Royalties Under the First Order

Under 30 U.S.C. § 1724(b)(1), "[a] . . . demand which arises from, or relates to an obligation, shall be commenced within seven years from the date on which the obligation becomes due and if not so commenced shall be barred."  A "demand" is a written order to pay that "specifically identifies the obligation by lease, production month and monetary amount of such obligation claimed to be due and ordered to be paid, as well as the reason or reasons such obligation is claimed to be due."  30 U.S.C. § 1702(26)(B).  Here, DCOR argues that the Director erred in finding the First Order to be a valid demand because (1) the

---

[17] Found at 30 C.F.R. § 1206.20.

First Order did not specifically identify the obligation and (2) the First Order did not state the reason for such obligation.  Pl.'s MSJ 43–47.  The Court agrees in part.

The Decision rationally concluded that the First Order complied with section 1702(26)(B).  The order provides a summary of oil and gas royalties due by property for the period January 2007 to December 2010, AR0017114–119, and elsewhere provides royalties due by lease.  AR0017113.

However, the Director erred in amending the reasoning of the First Order.  While the ONRR Director may correct errors in an underlying order, he or she may not implement new reasoning outside of the statutory deadline.  *See Devon Energy Production Company, L.P. v. Gould*, 421 F. Supp. 3d 1213, 1225–27, (D. Wyo. 2019).  Here, the First Order stated that DCOR's "transportation system begins at the central accumulation point located on the platforms," AR0017106, but denied some transportation allowances as incidental to marketing or related to production.  AR0017153–62; AR0017177–84; AR0017189–96.  DCOR then appealed these specific findings.  AR0017978–18009.  But the Decision did not address DCOR's arguments, instead concluding that all of DCOR's deductions were improper because transportation began at DCOR's royalty measurement point.  AR0017324.  The Director then "modified [the First Order] to be consistent with this decision," and increased the amount due under the First Order by nearly $2.4 million.  AR0017331.  The Director's Decision was not issued until August 2019, more than seven years after the February 2007–December 2010 sales period.  AR0017297.

The Director's adjustment to the First Order's analysis of transportation allowances violates 30 U.S.C. § 1724(b)(1).[18]  The Decision asserts that the appeals process permits entities like DCOR to challenge orders and allows ONRR to consider such challenges and reconcile inconsistencies.  AR0017335.  But the Decision here did not merely adjust methodology.  *Cf. Gould*, 421 F. Supp. 3d at 1227 (finding an order to be a valid demand despite the ONRR Director later stating that it had improperly disallowed transportation deductions).  The Decision instead provides an entirely different understanding of DCOR's "central accumulation" point than the First Order.[19]  And DCOR's argument that the First Order had misunderstood "gathering" did not provide a license for the Decision to supplant new reasoning into the First Order, nor increase the royalty amount on a basis not originally provided.  The Decision is thus more akin to a new demand than an adjustment, and such demand is invalid as to the 2007–2010 sales period because it came outside of the seven-year deadline.  The order to pay additional royalties under the First Order is thus time-barred,[20] and that portion of the Decision is arbitrary and capricious for clear error of judgment.  The Court will discuss remedies in Section VIII, *infra*.

---

[18] DCOR also contends that the Decision improperly adjusted the First Order by stating that the two-cent price differential was a nondeductible fee for monitoring and balancing production.  But the First Order did identify the amount as a "$.02 charge for [PSE's] services."  AR0017103.  The Decision merely elaborates on this statement in response to DCOR's argument that the First Order provided a mere legal conclusion.  AR0018010.

[19] The First Order merely stated where ONRR believed DCOR's central accumulation point was as part of its description of the audit calculations.  Unlike the Second Order, it did not assert that the central accumulation point is where production is measured for royalty purposes.  *Compare* AR0017110 *with* AR0017217.

[20] DCOR seeks to invalidate the First Order entirely.  But unlike the invalid order in *Gould*, the First Order provided a reason for requiring the initial royalty amount — improper transportation allowances.  *Cf. Gould*, 421 F. Supp. 3d at 1226 (vacating original order for

MEMORANDUM OPINION & ORDER – PAGE 19

## VIII.  THE COURT REMANDS THE CASE TO ONRR

While the APA requires courts to set aside arbitrary and capricious agency actions, "only in rare circumstances is remand for agency reconsideration not the appropriate solution." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021).  "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Id.*  Further, remand to ONRR is appropriate even if the thirty-three-month statutory window for agency action has passed. *Cont'l Res., Inc. v. Gould*, 410 F. Supp. 3d 30, 38 (D.D.C. 2019).

As discussed above, the Court concludes that the Decision is arbitrary and capricious on two bases: first, in failing to discuss whether the audit complied with the relevant standards, and second, in increasing the royalties due under the First Order. Nothing in the record indicates that ONRR cannot adequately address the audit issues on remand.  Accordingly, the Court remands the case to ONRR to evaluate DCOR's Statements of Reasons arguments that the audit did not comply with GAGAS.  Further, the Court vacates as time-barred the $2,370,400.62 in additional royalties due under the Decision's amendment to the First Order.  Given ONRR's now-vacated disposition of the First Order, ONRR never reached the merits of DCOR's arguments its First Statement of Reasons.  The Court, therefore, remands the case to ONRR to evaluate those unaddressed arguments.

---

failing to mention transportation deductions as a reason for increased royalties).  Thus, the First Order is a valid demand subject to the remedies provided in Section VIII, *infra*.

CONCLUSION

For the reasons set for above, the ONRR Director's Decision withstands arbitrary and capricious review with respect to the definition of gathering,[21] rejection of DCOR's two-cent deduction, and determination that the First Order states a specific obligation. However, the Decision is arbitrary and capricious in increasing royalties under the First Order and failing to address whether the audit complied with GAGAS.  Accordingly, the Court vacates the $2,370,400.62 in additional royalties due under the Decision's amendment to the First Order, and remands this case to ONRR for further proceedings to consider GAGAS compliance and the as-yet unaddressed arguments from DCOR's First Statement of Reasons.

Signed July 24, 2023.

David C. Godbey
Chief United States District Judge

---

[21] The Court acknowledges Amici's constitutional and APA rulemaking concerns.  *See* Brief of Amici Curiae American Petroleum Institute and National Ocean Industries [58]; Brief of Amici Curiae Ryan, LLC, the U.S. Oil & Gas Association, and the Southeast Oil and Gas Association [60].  But the Court will not consider arguments DCOR did not raise itself.  *See Anderson v. City of New Orleans*, 38 F.4th 472, 481 (5th Cir. 2022) ("For obvious reasons, new issues, generally, cannot be raised in an amicus brief."); *Christopher M. by Laveta McA v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991) ("As amicus curiae, Advocacy cannot raise an issue raised by neither of the parties absent exceptional circumstances").